FILED COPY

2010 DEC 29 PM 3: 48

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY _____

1  Cynthia L. Burch (State Bar No. 86020)
   cynthia.burch@kattenlaw.com
2  Steven A. Lamb (State Bar No. 132534)
   steven.lamb@kattenlaw.com
3  KATTEN MUCHIN ROSENMAN LLP
   2029 Century Park East, Suite 2600
4  Los Angeles, California 90067-3012
   Telephone: (310) 788-4400
5  Facsimile: (310) 788-4471

6  Attorneys for Plaintiff BNSF RAILWAY COMPANY

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10                     EASTERN DIVISION

11 BNSF RAILWAY COMPANY, a Delaware    CV 10 10057 SVW
   Corporation,                        Civil Action No.
12                                     COMPLAINT OF BNSF
                                       RAILWAY FOR
13         Plaintiff,                  DECLARATORY AND
                                       INJUNCTIVE RELIEF          PJWx
14      v.

15 UNITED STATES DEPARTMENT OF THE
   INTERIOR; UNITED STATES BUREAU
16 OF LAND MANAGEMENT; KEN
   SALAZAR, Secretary of the Interior;
17 ROBERT V. ABBEY, Director of the Bureau
   of Land Management; JIM STOBAUGH,
18 Project Lead, Bureau of Land Management;
   ROXIE C. TROST, Field Manager of
19 Barstow Office of Bureau of Land
   Management; CALIFORNIA ENERGY
20 COMMISSION; KAREN DOUGLAS, Chair
   of the California Energy Commission;
21 JAMES D. BOYD, Vice Chair of California
   Energy Commission; JEFFREY D. BYRON,
22 Commissioner of the California Energy
   Commission; ANTHONY EGGERT,
23 Commissioner of the California Energy
   Commission; ROBERT B.
24 WEISENMILLER, Commissioner of the
   California Energy Commission,
25
           Defendants.
26

27

28

                              COMPLAINT OF BNSF RAILWAY FOR
                              DECLARATORY AND INJUNCTIVE RELIEF

ORIGINAL

Plaintiff BNSF Railway Company ("Plaintiff" or "BNSF" complains and alleges as follows:

## 1. JURISDICTION AND VENUE

1. The claims asserted herein arise under federal laws and the Constitution, including the Commerce Clause, U.S.C.A. Const. Art. 1, §8, cl. 2 (the "Commerce Clause"), the Supremacy Clause, U.S.C.A. Const. Art. VI, cl. 2, Administrative Procedures Act, 5 U.S.C. §§551 *et seq.* ("APA"), the National Environmental Policy Act, 42 U.S.C. §§4321 *et seq.* ("NEPA"), the Federal Land Policy and Management Act, 43 U.S.C. §§1701 *et seq.* ("FLPMA"), the Federal Railroad Safety Act of 1970, 49 U.S.C. §§20101-20144; 21301-21304 ("FRSA"); the Rail Safety Improvement Act of 2008, Public Law 110-432 ("RSIA"); the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. §§10101, *et seq.* ("ICCTA"), and the Declaratory Judgment Act, 28 U.S.C. §§2201-2202. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331, 1346, 1361, and 1367.

2. Jurisdiction as to the California Energy Commission ("CEC" or "Commission") on the preemption claims and Commerce Clause claim is based on 28 U.S.C. §1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367. The state law claims arise under the California Environmental Quality Act, Cal.Pub.Res. Code §§21000 *et seq.* ("CEQA") and the Warren-Alquist Act, Cal.Pub.Res. Code §§25500 *et seq.*.

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because this action relates to federal lands located within this judicial district and a substantial part of the events giving rise to the claims occurred in this district.

## 2. INTRODUCTION

4. BNSF operates in 28 states in the midwestern and western United States and Canada. It is the product of hundreds of predecessor companies that were merged

- 1 -

or acquired over the past 150 years to form a unified interstate system. It is the second largest railroad in North America, and has a large freight rail presence in California and in the Mojave Desert. BNSF participated in both the federal NEPA and state CEQA proceedings related to the Calico Solar Project, which led to the federal and state actions at issue here.

5. Railroads provide the most efficient, environmentally protective, and safest form of overland freight transportation in California (or any other state), and it is the policy of the Federal Government and the State of California to promote freight rail transportation.

6. This is an action to protect and preserve BNSF's transcontinental mainline. The BNSF mainline is a critical rail traffic artery that transports interstate commerce among 28 states and Canada. Defendants are responsible for issuing federal and state authorizations for a solar energy generation facility known as the Calico Solar Project.

7. The Calico Solar Project will surround approximately five (5) miles of the BNSF mainline with tens of thousands of dangerous SunCatcher solar dishes.

8. The SunCatchers are dangerous because they collect and emit solar radiation into the environment. Available scientific studies have established that a single SunCatcher is hazardous to human receptors, such as but not limited to train crews on BNSF's mainline.

9. While no studies have established the "safe distance," the only current study establishes that a human receptor within 223 feet of a single SunCatcher will likely experience temporary flash blindness. The study establishes that beyond 223 feet a single SunCatcher may cause nuisance distractions or veil objects, such as train signals.

- 2 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

10. Train signals are critical safety features that train crews must observe and timely respond to in order to prevent derailment, collisions, and other catastrophes that may result in injury or loss of human life and/or destruction and damage to goods, structures, and the environment.

11. There has not been a scientific study to measure the effect of tens of thousands of SunCatchers on a human receptor. Nor has there been a site specific study to measure the impact of tens of thousands of SunCatchers on train crews.

12. Notwithstanding the clear and present danger that SunCatchers pose to BNSF train crews, the federal defendants have failed to analyze this threat or to provide for any mitigation measures to protect BNSF train crews. While the federal defendants mandate a 500-foot offset from the SunCatchers to motorists along nearby Interstate 40, they provide for no offset or buffer between the SunCatchers and the BNSF mainline.

13. Despite their own experts' concession that further studies need to be done to ascertain the impact of tens of thousands of SunCatchers on train crews, the state defendants have relied inappropriately on a single scientific study that measured the impact of a single SunCatcher on a human receptor. Accordingly, the state defendants provide for an insufficient offset of 223 feet from the BNSF mainline.

14. In tacit recognition of this inadequacy, the state defendants impermissibly seek to preempt well established federal laws, regulations, and standards regarding signals on the BNSF mainline. Through their actions, the state defendants impermissibly issued an order mandating that BNSF cooperate with Calico Solar LLC ("Calico Solar") regarding signal modification to be effected on BNSF's mainline. Further, the order impermissibly purports to bestow upon a state agency the authority to make the final determination with respect to the safety of the BNSF mainline.

- 3 -

15.     The Calico Solar Project will be built on an alluvial plain, which drains to both sides of the BNSF Right-of-Way ("BNSF ROW"). Project related increases in the volume and velocity of flooding from the Calico site, as well as changes in the direction of runoff, pose hazards to rail operations and infrastructure within the BNSF ROW. Studies have not been performed to determine where feasible on-site mitigation can be implemented to eliminate these hazards.

**3.     THE PARTIES**

16.     BNSF is a Delaware corporation doing business in the United States and this judicial district.

17.     Defendant Department of the Interior ("Interior") is responsible for administration and management of federal lands, including those under the jurisdiction of the Bureau of Land Management and those at issue in this action.

18.     Defendant Bureau of Land Management ("BLM") is a department or subdivision of Interior and has the responsibility of managing federal lands, including those at issue in this action.

19.     Defendant Ken Salazar is Secretary of the Interior and is named in his official capacity.

20.     Defendant Robert Abbey is Director of the BLM and is named in his official capacity.

21.     Defendant Jim Stobaugh was the Principal Lead for the BLM for the Calico Solar Project and is named in his official capacity.

22.     Defendant Roxie C. Trost is the Field Manager of the Barstow Office of the BLM and is named in her official capacity.

23.     Defendants Interior, BLM, Salazar, Abbey, Stobaugh, and Trost are hereafter sometimes referred to collectively as the "Interior Defendants".

- 4 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

24. Defendant California State Energy Resources Conservation Development Commission of the California Resources Agency, operating as the California Energy Commission ("Commission" or "CEC"), is an operating agency of the State of California created by the Warren-Alquist Act and is responsible for, among other things, the processing of applications for certification of solar energy generating facilities situated within the State of California.

25. Defendant Karen Douglas is the Chair of the CEC and is named in her official capacity.

26. Defendant James D. Boyd is the Vice Chair of the CEC and is named in his official capacity.

27. Defendant Jeffrey D. Byron is a Commissioner of the CEC and is named in his official capacity.

28. Defendant Anthony Eggert is a Commissioner of the CEC and is named in his official capacity.

29. Defendant Robert B. Weisenmiller, is a Commissioner of the CEC and is named in his official capacity.

30. Defendants CEC, Douglas, Boyd, Byron, Eggert, and Weisenmiller are hereafter sometimes referred to collectively as the "Commission Defendants."

4. **BRIEF OVERVIEW OF AGENCY ACTIONS**

31. On March 14, 2007, SES Solar Six, LLC and SES Solar Three, LLC, predecessors in interest to Calico Solar, submitted applications for right-of-way ("ROW") grants to the BLM to construct and operate a concentrated solar thermal power plant facility on public lands in San Bernardino County, California. The two ROW application areas were subsequently combined into one, the Calico Solar Project.

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

32. On December 22, 2008, Calico Solar filed an Application for Certification before the CEC.

33. On March 30, 2010, BLM (together with the CEC) issued the Staff Assessment and Draft Environmental Impact Statement ("SA/DEIS").

34. On May 5, 2010, the CEC and BLM elected to forego any further joint environmental analysis.

35. On July 21, 2010, the CEC issued the Supplemental Staff Assessment.

36. On August 6, 2010, BLM issued the Final Environmental Impact Statement ("FEIS").

37. On August 9, 2010, the CEC issued the Supplemental Staff Assessment, Part II ("SSA II").

38. On September 3, 2010, the 30-day review period of the FEIS under NEPA closed.

39. On October 20, 2010, Interior published a notice of availability of a Record of Decision for the Calico Solar Project and Amendment to the California Desert Conservation Area Land Use Management Plan (hereafter the "Calico ROD"). [Record of Decision for the Calico Solar Project and Associated Amendment to the California Desert Conservation Area Resource Management Plan (Notice of Availability), 75 Fed. Reg. 65660 (Oct. 20, 2010).]

40. The Calico ROD Land Use Plan Amendment and Right-of-Way and Route Closure Authorization were signed by Robert Abbey, Director of BLM, on October 18, 2010. The Calico ROD was signed by Ken Salazar, Secretary of Interior, on October 20, 2010.

41. The actual Calico Solar BLM Right-of-Way Lease Grant (the "Calico ROW") is a separate document issued by the BLM, contains a full legal description of the affected properties, and contains, among other things, terms and conditions with

- 6 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

which Calico Solar must comply in order for the Calico ROW to take and remain in effect.

42.     The Calico ROD approves issuance of the Calico ROW to federal, BLM-administered lands in the Mojave Desert to a private corporation, Calico Solar, for the development of a utility-scale solar generating power plant with a capacity of up to 663.5 MegaWatts ("MW") (the "Calico Solar Project").   The Calico Solar Project consists of 4,604 acres of BLM-administered land.

43.     The Calico ROW is situated in the Mojave Desert approximately 37 miles east of Barstow, California.   The Calico ROW is immediately adjacent to Interstate 40.  It contains public lands that have been set aside as part of the California Desert Conservation Area to protect endangered species such as but not limited to the Desert Tortoise, the Mojave Fringe-toed Lizard, Bighorn Sheep, and the White-margined Beardtongue.  The planned footprint of the Calico Solar Project utilizes the Calico ROW and surrounds approximately five (5) miles of BNSF mainline track.

44.     On October 28, 2010, the CEC approved the Application for Certification of the Calico Solar Project (the "Commission Decision").   The Commission Decision was signed by the Commission Chair, Karen Douglas, the Vice Chair, James D. Boyd, and by Commissioners James D. Byron, Anthony Eggert, and Robert B. Weisenmiller.

45.     On November 19, 2010, the Chair of the Commission issued an order staying the effective date of the Commission Decision pending a hearing set for December 1, 2010.

46.     On December 1, 2010, the CEC issued a Revised Notice of Decision, changing the effective date of the Commission Decision to December 1, 2010.

- 7 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

47. The Commission Decision approves construction of the Calico Solar Project, subject to certain Conditions of Certification and the oversight and direction of the Commission Project Manager (the "CPM").

**5.** **IMPACT ON BNSF's MAINLINE**

48. BNSF is one of two Class 1 railroads operating in California. BNSF's transcontinental mainline, traversed by as many as 80 trains per day, carries interstate commerce from the Ports of Los Angeles and Long Beach to U.S. Midwestern, Southwestern and Eastern markets. For over one hundred years, BNSF's mainline has operated through the section of the Mojave Desert where the Calico Solar Project is to be constructed. Approximately 40 percent of all of the nation's west coast imports and exports transit Class 1 mainlines in California.

49. Calico Solar plans on emplacing up to 26,540 SunCatchers, a new 230-kilovolt ("kV") substation, two miles of transmission lines, a main services complex, a substation, and hundreds of miles of access and maintenance roads within the Calico ROW. BNSF's approximately five (5) miles of mainline that runs through the Calico Solar Project site contains two at-grade crossings and a significant curve, changes elevations, requires train crews to adjust speed through curves and elevation changes, and employs six signals that serve as critical safety features on which the train crews rely to ensure that they do not collide with other trains moving through the section.

50. The proposed Project would be located in an area characterized by braided stream channels, flash flooding, alluvial fan conditions, low rainfall, sparse vegetation, and the potential for wind erosion/deposition. The agencies' studies have determined that stormwater, sedimentation and debris from the proposed Project site would be transported onto the BNSF ROW, which, if not properly mitigated, would pose flood hazards to rail infrastructure and operations within the BNSF ROW.

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

51. Calico Solar's proposed development plans have, at various times, included plans to cross the BNSF mainline and ROW in three separate locations: (1) initially an above-grade crossing (bridge), and later an at-grade crossing at the BNSF Maintenance-of-Way crossing ("MOW Crossing") at Hector Station; (2) an above-grade crossing (bridge) approximately two miles east of the BNSF's Hector Station; and (3) an at-grade emergency crossing approximately five miles east of BNSF's Hector Station at Pisgah.

52. The BNSF MOW Crossing at Hector Station is a private MOW Crossing that connects two transcontinental mainline tracks. Maintenance-of-Way roads ("MOW Roads") run parallel to the mainline tracks within the BNSF Right-of-Way ("ROW"). MOW Roads are private roads within the BNSF ROW that allow BNSF access to service the mainline.

53. The MOW Crossing and the BNSF MOW Roads are all exclusively within BNSF's ROW.

54. Hector Station is used by BNSF to lay down materials for railroad infrastructure and operations, and for setting on and off track supervisor equipment to inspect the tracks.

55. Whereas most of the section of the BNSF ROW that is surrounded by the Calico ROW is 100 feet wide from the center line of the tracks, BNSF's Hector Station and lay down area where the MOW Crossing is situated is 200 feet wide from the center line of the tracks, to accommodate materials, infrastructure, and operations.

56. Additionally, Calico Solar's proposed development plans have included lateral access within BNSF's ROW at BNSF's Hector Station.

57. The Calico Solar ROW specifically excludes all lands contained within the BNSF ROW, to include the BNSF Hector Station and the MOW Roads within the BNSF ROW.

- 9 -

58.     Both BLM and the CEC have acknowledged that they have no authority to grant Calico Solar access to enter, cross, or travel within the BNSF ROW.

59.     Neither BLM nor the CEC has the authority to grant Calico Solar access to enter, cross, or travel within the BNSF ROW.

60.     The Calico Solar Project was approved without first properly determining that access to the entire Project site had been obtained by the Project applicant.

61.     Interior's approval of the Calico ROD, the amendment of the California Desert Conservation Area Land Use Management Plan (the "CDCA Plan"), and issuance of the Calico ROW violate the Constitution, federal laws, regulations, polices and standards and are, therefore, unlawful.

62.     The Commission Decision violates the Constitution, federal laws, regulations and standards that preempt state oversight of train signal operations and safety.  Moreover, the Commission Decision is in violation of state laws, regulations and standards and is, therefore, unlawful.

63.     The Calico Solar project is one of several large solar and renewable energy projects seeking to use large tracts of BLM-administered lands in the Mojave Desert that have been recently approved, or are otherwise under consideration for approval, by Interior.

64.     The required administrative process leading up to the ultimate approval of the Calico ROD and the Commission Decision were inadequate and failed to meet the requirements of applicable federal and state laws, regulations, polices and standards.  Moreover, the administrative process was unduly rushed and requisite steps such as the establishment of mitigation measures were improperly avoided or deferred for the express purpose of accommodating Calico Solar's construction schedule.  This was done so that the Calico Solar project could qualify for funding

- 10 -

incentives under the American Recovery and Reinvestment Act of 2009, Public Law 111-5 ("ARRA").

65.    BNSF seeks a declaratory judgment that Defendants Interior and BLM have violated and are violating the Constitution, federal laws, regulations, policies and standards, including but not limited to: (1) the Commerce Clause; (2) APA; (3) NEPA; (4) FLPMA; (5) the CDCA Plan; (6) ICCTA; (7) FRSA; (8) RSIA;  and (9) GCOR, by approving, executing, and implementing the Calico ROD.

66.    BNSF seeks an order: (1) vacating the Calico ROD, including the amendment to the CDCA Plan and approval of the Calico ROW; (2) permanently enjoining issuance of the Calico ROW and Notice to Proceed for the Calico Project; and (3) permanently enjoining amendment of the CDCA Plan for development of the Calico Project on the present proposed site.

67.    BNSF seeks a declaratory judgment that the Commission and its officials, officers and agents (collectively the "Commission" or the "CEC") have violated and are violating the Constitution, federal laws, regulations, policies and standards, which preempt state oversight of train signal operations and safety, including but not limited to: (1) the Commerce Clause;  (2) APA; (3) NEPA; (4) FLPMA; (5) the CDCA Plan; (6) ICCTA; (7) FRSA; (8) RSIA;  and (9) GCOR, by approving, executing, and implementing the Commission Decision.

68.    BNSF seeks an order: (1) vacating the Commission Decision; (2) permanently enjoining issuance of the Commission Decision; and (3) permanently enjoining construction and development of the Calico Project on the present proposed site.

69.    To avoid irreparable injury, BNSF seeks a preliminary injunction against any issuance of a Notice to Proceed in relation to the Calico ROD and/or the

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

Commission Decision, and to enjoin Interior, BLM, and the Commission from authorizing any ground disturbing activities on the Calico Solar site.

## 6.     GENERAL ALLEGATIONS

### A.     The Federal NEPA and FLPMA Process

70.     As alleged above, Calico Solar's predecessor submitted its ROW application on March 14, 2007.

71.     The proposed Project requested that BLM issue a ROW over public lands under FLPMA.  Issuance of the ROW would require an amendment of the CDCA Plan.

72.     On March 30, 2010, consistent with a Memorandum of Understanding between BLM and the CEC (the "MOU"), the BLM and CEC issued the SA/DEIS. The MOU was attached as Appendix B to the FEIS.

73.     The SA/DEIS analyzed the proposed Project, a Reduced Acreage Alternative (consisting of 2,320 acres), and an Avoidance of Acquired and Donated Lands Alternative (consisting of 6,512 acres).

a)     The SA/DEIS identified a complex series of debris and detention basins on the northern border of the proposed Project site and within the site as project features.  [SA/DEIS at ES-5, ES-24, C.2-11.]

b)     The SA/DEIS Section on Hydrology,/Soil & Water makes a finding that the proposed project "could result in impacts that would be significant with respect to . . . National Environmental Policy Act significant criteria specified in 40 CFR 1508.27," and makes it clear that the detention basins are an essential mitigation measure in the Project. [SA/DEIS at C.7-1-C.7-2; C.7-29.]

c)     The SA/DEIS specifically found that the drainage pattern of the proposed Project site would channelize flood water runoff and

- 12 -

sedimentation toward the BNSF ROW, with "ultimate discharge to the BNSF ROW."  [SA/DEIS at C.7-29.]

74.     On May 5, 2010, the CEC and BLM elected to forego any further joint environmental analysis.  [May 5, 2010,  Notice of Availability, Staff Assessment and Draft Environmental Impact Statement for the Proposed Calico Solar Project ("Notice of Availability").]  The Notice of Availability stated that "[t]he Energy Commission and the BLM have been jointly conducting the state and federal environmental review for the Calico Solar Project and recently released a joint SA/DEIS; however, the two agencies have now determined that it is necessary to produce separate, but coordinated, final environmental reviews and decision documents."  [Notice of Availability at p. 1.]

75.     On July 1 and 29, 2010, BNSF submitted to BLM comment letters requesting, among other things, that BLM take into consideration during its NEPA review and analysis the impact of the proposed Calico Solar Project on BNSF rail operations and safety.  BNSF specifically raised concerns that:

a)      the detention basins detailed in the SA/DEIS along the northern border of the Project site and within the site itself would not be adequate to protect BNSF from increased off-site flooding as a result of the emplacement of tens of thousands of SunCatchers, a main services complex, a substation, and hundreds of miles of roadways – all of which would increase the impervious surfaces within the Project area and thereby increase flooding and runoff [Exhibit 1207]; and

b)      the thousands of SunCatchers would pose a safety hazard to BNSF train crews and operations because of glint and glare associated with the mirrored surfaces from the SunCatchers [Exhibit 1208].

- 13 -

76.     As alleged above, the FEIS was released August 6, 2010.  By the time the FEIS was issued, Calico Solar had modified its proposed project to a smaller footprint, consisting of 6,215 acres, but was still planning to generate 850-MW.  This modified proposed project was identified as Alternative 1a.

77.     The SA/DEIS did not include any analysis of Alternative 1a.

78.     The SA/DEIS acknowledged that "[t]he SunCatcher mirrors . . . may pose a visual hazard to . . . crews and passengers on trains traversing the project on BNSF tracks."  According to the SA/DEIS, "[CEC] staff has determined that the impacts of the SunCatchers may present a hazard to . . . train crews and passengers and is in the process of obtaining additional information to determine the impact of the SunCatcher mirrors."  [SA/DEIS at C.11-15.]

79.     CEQ regulations require an EIS "…to identify the agency's preferred alternative…in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such preference."  [FEIS at 2-25 (citing 40 CFR § 1502.14(e) ).]

80.     BLM crafted a new alternative that it described and analyzed for the first time in the FEIS.

a)      Alternative 1a was identified and purportedly analyzed in the FEIS through a Determination of NEPA Adequacy ("DNA").  [See FEIS at Appendix C.]

b)      The FEIS continued to refer to the complex series of debris and detention basins as essential project features.  [FEIS at 4-362, 371-372.]

c)      "Due to the project area's susceptibility to flash flooding and prolonged periods of precipitation, high intensity and short duration runoff events coupled with earth disturbance activities could result in accelerated on-site erosion....  Off-site flow would be intercepted prior to entering the

- 14 -

project site using large debris basins constructed on-site and located at the toe of each mountainous drainage basin....  On-site runoff would be intercepted in detention basins which would be sized to retain the 100-year on-site stormwater discharge runoff and debris flows...."  [FEIS at 4-362.]

d)   "The detention/debris basins inside the northern boundary of the project site would be of sufficient size to completely retain flood flows resulting from a 100-year flood.  Following significant storms, retained water would be released into the existing channels in a controlled and metered manner at a rate that is designed to not cause damage to SunCatcher pole foundations located within the channels."  [FEIS at 4-371-372.]

81.   The FEIS did not evaluate the impact of glint and glare on BNSF's train crews or rail operations.  According to the FEIS, "[d]ata on anticipated brightness or luminance of the SunCatcher units and the Calico Solar Project is not available . . .."  [FEIS at 4-349.]

82.   On September 3, 2010, pursuant to BLM's notice period for review of the FEIS and protest period for the proposed Calico ROW, BNSF submitted a comment and protest letter that set forth its concerns with glint and glare.  The September 3, 2010 comment and protest letter attached the July 1st and 29th comment letters and sworn testimony from BNSF employees and experts in support of BNSF's concerns.

83.   On September 3, 2010, the CEC Committee overseeing Calico Solar's Application for Certification rejected Alternative 1a, which was BLM's preferred alternative and the alternative analyzed in the FEIS.

84.   That same day, the CEC issued an Order Directing Further Review of Reduced Footprint Alternatives ("Reduced Footprint Alternatives Order"), finding that

- 15 -

"[t]he Committee can not recommend approval of the Calico Solar project as proposed by the Applicant due to the scope and scale of high quality habitat affecting desert tortoises and bighorn sheep that would be lost in order to construct and operate the project."

85.     Consequently, on September 7, 2010, Calico Solar, in the CEC proceedings, proposed several reduced footprint alternatives.   Each of these alternatives eliminated debris, retention and detention basins that were included in both the SA/DEIS and FEIS – debris, retention and detention basins that were included to provide necessary mitigation for the significant adverse impacts to the BNSF ROW and rail operations that were anticipated from  hydrological and sedimentation impacts resulting from the Calico Solar Project.

86.     The alternative ultimately adopted by BLM and certified by the CEC is referred to as Alternative 5.5.  Alternative 5.5 reduces the acreage of the proposed Project to a 4,613 acre site with an electrical generation capacity of 663.5-MW.

87.     Alternative 5.5 was not analyzed or identified in either the SA/DEIS or the FEIS.

88.     On October 19, 2010, BNSF wrote to BLM asking that BLM hold off issuing the Calico ROD and schedule a meeting pursuant to the BLM Land Use Handbook, Appendix E, "to review Alternative 5.5 with a view toward resolving BNSF's Protest and mitigation issues in relation to Alternative 5.5"  BLM never responded to BNSF's letter.

89.     Also on October 19, 2010, BNSF wrote to BLM setting forth supplemental comments regarding hydrology issues raised by Alternative 5.5, noting that there has been no opportunity for public comment in the BLM proceeding regarding Alternative 5.5, and requesting that BLM re-circulate the FEIS and provide an opportunity for public comment.  BLM never responded to BNSF's letter.

- 16 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

90.    On October 20, 2010, BLM and Interior issued the Calico ROD.

a)    The Calico ROD adopted Alternative 5.5 as the "Modified Agency Preferred Alternative," and issued a second DNA purportedly analyzing the Modified Agency Preferred Alternative.

b)    The second DNA, dated October 13, 2010 and attached as Appendix 6 to the Calico ROD, notes that the detention basins that were project features in the SA/DEIS and FEIS have been eliminated.  [Calico ROD, Appendix 6 at p. 6.]

c)    The FEIS repeatedly provides that, "When developing the Record of Decision for the proposed Calico Solar project and CDCA Plan Amendment, the BLM may consider the SA/DEIS Conditions of Certification additional Conditions of Certification from the Supplemental SA, and other mitigation measures developed by the BLM and other regulatory agencies."  [See, e.g., FEIS at 4-334 (Traffic and Transportation).]

d)    Appendix 4 to the ROD contains Attachment I, Summary of California Energy Commission Conditions of Certification and Bureau of Land Management Monitoring.  Appendix 4 contains no mitigation measures to protect BNSF train crews from glint and glare, although it does contain a mitigation measure that requires Calico Solar to set back the nearest SunCatcher units "a minimum distance of 500 feet from the edge of the roadway [I-40]."  This mitigation measure is prescribed "[t]o reduce the visual dominance and glare effects of the SunCatchers to motorists on I-40."  [See VIS-3 at Calico ROD, Appendix 4, I-98.]

- 17 -

e)      BLM never conducted an independent analysis of the Conditions of Certification proposed by the CEC and never afforded the public an opportunity to comment on any such analysis.

91.    Therefore, the preferred agency alternative ultimately adopted by BLM was never available before the BLM issued the FEIS.  The FEIS should have been re-circulated for public comment in relation to the Modified Agency Preferred Alternative, but never was.  As such, there was never an opportunity for public comment in the NEPA process relating to the Modified Agency Preferred Alternative, in violation of NEPA.

**B.**      **The State CEQA and Warren-Alquist Process**

92.    Calico Solar first filed its Application for Certification before the CEC on December 22, 2008.  At that time, the proposed Project consisted of an 8,230 acre, 850-megawatt (MW) solar energy facility on BLM-administered land.

93.    As alleged above, on March 30, 2010, the CEC (together with BLM) issued the SA/DEIS.

94.    On July 21, 2010, the CEC issued the Supplemental Staff Assessment.

95.    On August 9, 2010, the CEC issued the SSA II.  The SSA II noted that:

a)      "The SunCatcher mirrors have the potential to . . . pose a hazard in the form of temporary flash blindness to . . . crews on trains traversing the project on BNSF tracks."  [SSA II at C.11-19]

b)      "[T]he impacts of SunCatchers could present, if not mitigated, a significant hazard to motorists and train crews."  [SSA II at C.11-19.]

c)      Condition of Certification TRANS-7 was purportedly designed to designed to "reduce to less than significant the operational impacts of the SunCatchers to . . . BNSF Railway and AMTRAK train crews and passengers."  [SSA II at C.11-19.]

- 18 -

d)      SSA II notes that "BNSF Railway's representatives also expressed a concern about glint and glare and its effects on the railroad engineer's ability to correctly perceive the color of the signal."  According to the SSA II, "Staff determined that measures exist, if needed, to ensure that BNSF Railway engineers will be able to correctly perceive the color of the signal.   Those procedures involve hooding and increasing the intensity of the lights."  [SSA II at C.11-32.]

96.      There is no scientific basis for Staff's claims that adequate mitigation measures exist or that hooding or increasing the intensity of train signals will mitigate the problem.

97.      SSA II contains a number of Conditions of Certification, including TRANS-7.  TRANS-7 contains a section entitled "Signal Light Modifications," which requires that BNSF work with Calico Solar to determine and develop shields to affix to signal lights to increase the contrast so that they can be seen and responded to in adequate time to ensure safety to rail operations.  [SSA II at C.11-36.]

98.      TRANS-7 also provides that Calico Solar shall develop a monitoring plan for defective shields that will be submitted to the CPM for review and approval. [SSA II at C.11-37.]

99.      Attached to SSA II is Appendix A, a scientific study entitled "Daytime Intrusive Brightness Analysis for Stirling Engine Solar Energy Systems, authored by James Jewell, Alan Lindsley, and Clifford Ho, Ph.D., of Sandia National Laboratories (the "Ho Glint/Glare Study").

100.    The Ho Glint/Glare Study is the only scientific study considered by the CEC relating to the impact of glint and glare.

101.    The Ho Glint/Glare Study is not site specific, and therefore does not analyze the effect of topography and site features on glint and glare as it impacts

- 19 -

BNSF's ROW, rail operations, and the ability of train crews to see and respond to signals.

102.    The Ho Glint/Glare Study measures the impact of a single SunCatcher on a human receptor.

103.    The Ho Glint/Glare Study did not measure the impact of tens of thousands of SunCatchers on train crews.

104.    The Ho Glint/Glare Study does find that:

a)    "Temporary flash blindness is caused by excessive light exposure that saturates the retinal pigments, causing a visual image of the glint or glare to remain temporarily after the intrusive light exposure."  [SSA II, Appendix A at p.6.]

b)    "Veiling reflections are caused by a reflection that, when perceived by the human eye, decreases visual acuity to either side of the reflection and progressively gets better as one moves the eye away form the intrusive light source." [SSA II, Appendix A at p. 6.]

105.    The Ho Glint/Glare Study does find that:

a)    "Temporary Flash Blindness (After-Image):  Within 223 feet of the SunCatchers, there is a strong potential for temporary after-image effects.  [SSA II, Appendix A at p. 7.]

b)    "Veiling Reflections and/or Distracting Glare:  Beyond the distance that may cause temporary flash blindness, intrusive light may cause nuisance distractions or veil other objects (e.g., signal indicators for train operators) in the visual field)."  [SSA II, Appendix A at p. 76.]

106.    The Ho Glint/Glare Study makes no reference to hooding train signals, increasing intensity of train signals, or otherwise modifying train signals to protect

- 20 -

train crews from the impact of what is referred to as "veiling distractions" or the "halo effect."

107.    During evidentiary hearings held by the CEC on August 18, 2010, Alan Lindsley, co-author of the Ho Glare/Glint Study, admitted that the Staff did the Ho Glare/Glint Study because Calico Solar had not prepared a sufficient study.  Lindsley agreed that:

a)    The Ho Glare/Glint Study was for single SunCatcher;

b)    No study was done for multiple SunCatchers in array;

c)    "[W]hen you add one light source to another light source that increases the magnitude of the effect on the recipient";

d)    Without a further, site specific study regarding rail operations, no one can determine if it is safe for rail operators;

e)    A further study needs to be done.  [Transcript of Hearing of August 18, 2010 ("8/18/2010 TR") at 29:14-30:24.]

108.    Lindsley further agreed that:

a)    BNSF's request that a site specific, rail specific study be performed prior to emplacing a single SunCatcher is reasonable [8/18/2010 TR at 34:9-12]; and

b)    Only BNSF can determine whether it is going to be safe for train crews. [8/18/2010 TR at 35:2-36:5]

109.    Dr. Ho testified that a computer simulation model that is site specific, which was recommended by BNSF's experts, is reasonable.  Dr. Ho further testified that BNSF's request that a site specific, rail specific study be performed prior to emplacing a single SunCatcher is reasonable.  [8/18/2010 TR at 36:23-38:8]

110.    Dr. Ho further agreed that:

- 21 -

a)   The Ho Glare/Glint Study was for single SunCatcher [8/18/2010 TR at 37:15-18];

b)   An off-site, physical replication of site should be done [8/18/2010 TR at 40:9-18];

c)   223 feet is the minimum safe distance from a single SunCatcher [8/18/2010 TR at 40:24-41:2];

d)   It would be prudent to have an additional setback beyond 223 feet [8/18/2010 TR at 62:2-7].

111.   Dr. Ho also testified as to the veiling reflections or halo effect, and stated there has been no measurement of the halo effect of multiple serially aligned SunCatchers.  [8/18/2010 TR at 6223:-63:2.]

112.   According to Dr. Ho, "beyond 223 feet there is a low potential for temporary flash blindness" and "if you have multiple light sources that's going to change the calculation."  [8/18/2010 TR at 42:15-43:14.]

113.   During the August 18th evidentiary hearings on the impact of glint and glare, Calico Solar presented no testimony from experts.  Nor was any documentary evidence offered by Calico Solar that was accepted by the CEC.  The sole piece of offered documentary evidence was a purported study of glint and glare on another project, which was properly rejected by the CEC and not admitted into evidence.

114.   BNSF presented evidence in the form of written and oral testimony by two BNSF employees responsible for train signals, Joseph Schnell and Dennis Skeels, and an expert in cognitive neuroscience, David Krauss, Ph.D.  Their written testimony was accepted as Exhibits 1203, 1204, and 1205, respectively.  They augmented their written testimony at the hearing and presented themselves for cross examination by Calico Solar, CEC Staff, and other intervenors.

- 22 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

115.   Mr. Schnell testified that BNSF runs approximately 80 trains a day on its double mainline, which runs through the area where Calico Solar plans to locate its solar plant.  [8/18/2010 TR at 94:6-14.]

116.   Mr. Schnell also testified that the BNSF mainline has been operating for over one hundred years, and approximately 40% of the United States' exports and imports from and to the west coast are carried by rail.  [8/18/2010 TR at 94:11-95:2.]

117.   Mr. Schnell testified that BNSF must maintain sole and absolute discretion to ensure that its train operations are safe and efficient.  BNSF's signal system is the safety system that allows such a large number of trains to run safely through the area.  Mr. Schnell elaborated that BNSF "cannot afford to have outside entities dictating to us how we're going to signal because they just don't understand how the signal system works and how they can make it safe."  [8/18/2010 TR at 95:7-18.]

118.   Mr. Schnell explained how the signal system operates and how critical it is to ensure that there is not a "catastrophic failure," such as a derailment.  [8/18/2010 TR at 95:19-96:20.]

119.   Mr. Schnell further testified that BNSF is in a regulated industry and is subject to federal regulations.  [Schnell, 8/18/2010 TR at 96:21-97:19.]

120.   Railway operations, including safety procedures and requirements, are prescribed by federal law and regulations adopted by the Federal Railway Administration. (the "FRA").  The FRA operates under a comprehensive scheme of laws and regulations contained in Title 49 of the United States Code,  in Title 49 of the Code of Federal Regulations, and through various executive and administrative orders and rules that prescribe the operation and safety of the rail system of interstate commerce in the United States (collectively referred to as "Railroad LORS").

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

121.   As Mr. Schnell explained, BNSF is required to operate in a manner consistent with Railroad LORS.   Railroad LORS require BNSF to maintain visual contact with signals.   If a train's contact with a signal is lost and cannot be regained, the engineer is required to stop the train.   This often requires an emergency application of the brakes, risking derailment of the train.   As Mr. Schnell testified, "the engineer is forced to stop the train, an emergency application, if necessary, which means full application of the brakes, all the wheels will lock up, and that's where we have great potential to derail."   [8/18/2010 TR at 97:11-14.]

122.   In describing the potential for a "catastrophic failure" when an engineer misses a signal, Mr. Schnell testified that, "We could run into another train, we could derail on a broken rail, we could run through a switch and derail on the switch, take out both main lines and [the] bottom line is people could get killed."   [8/18/2010 TR at 96:16-20 .]

123.   When a train has been stopped through emergency application of the brakes, BNSF General Code of Operating Rule ("GCOR") 6.23 requires the engineer to inspect all cars, units, equipment and track pursuant to  BNSF special instructions and rules.   [8/18/2010 TR at 96:21-97:19.]

124.   This can cause significant delays to rail operations with ramifications reaching from the Ports of Los Angeles and Long Beach to Chicago and beyond.   [8/18/2010 TR at 97:23-98:4.]

125.   Railroad LORS include numerous requirements relating to train signals, including the Rail Safety Improvement Act of 2008, which reserves to the FRA the sole and exclusive right to control and regulate:

a)      "[P]erformance standards for processor-based signal and train control systems" [49 U.S.C. §20161(7)];

- 24 -

b) "[The] qualification of new or novel technology at highway-rail grade crossings" [49 U.S.C. §20161(7)];

c) The duties and responsibilities, to include specifically limiting the duty hours, of railway signal employees [49 U.S.C. § 21104]; and

d) Federally funded capital projects designed to, among other things, "mitigat[e] environmental impacts [and implement] communication and signalization improvements." [49 U.S.C. §24401(2)].

126. Mr. Schnell testified that he has reviewed SSA II as it relates to glint and glare and that it simply does not appropriately address all of BNSF's significant concerns. In particular, Mr. Schnell explained that putting up the SunCatchers and fixing the problem later would not work. BNSF "can't afford it," because if the engineer misses a signal and derails a train, "it's too late." [TR at 98:5-99:15.]

127. Mr. Schnell testified that the Ho Glint/Glare Report did not address the rail safety and operational issues raised by BNSF. Mr. Schnell explained that BNSF was told that Staff was going to expand the scope of its glare/glint study to address these issues. In a call facilitated by CEC Staff person Ms. McLean, Mr. Schnell initially spoke with Dr. Cliff Ho of Sandia labs. [Exhibit 1203.]

128. Dr. Ho explained that he had been asked to perform some calculations to determine what the appropriate safe distance was from the SunCatcher for a motorist. His work was not specific to the Calico Solar facility, did not address rail operations and safety, and measured the impact of a single SunCatcher. Ms. McLean then facilitated a second call, to James Jewell, the consultant retained by Staff to head the study. Mr. Jewell requested information from BNSF that he represented was essential for him to complete his study. [Exhibit 1203 and Exhibit A attached thereto (a string of emails that started on July 29, 2010 from Mr. Jewell).]

- 25 -

129.   Mr. Schnell testified that, in his July 29th email, Mr. Jewell asked BNSF to provide him with information regarding:

a)   height of signal poles,

b)   height of the mid-point of the signal above the track,

c)   height of the eyes of the average engineer above the track,

d)   distance from a signal pole at which an engineer is expected to recognize and act upon a signal,

e)   average width or consistent width of the BNSF ROW, and

f)   number and location of signal poles within the solar plant area and just before or after the plant boundary.

Mr. Jewell represented that he needed this information to "establish the viewing angles and distances and then to discern just which signals may be seen against the SunCatcher mirrors and at what angular relationships.  All of this information will make it possible for me to establish the requirements of a study."  [Exhibit 1203 and Exhibit A attached thereto.]

130.   Mr. Schnell explained that, as can be verified from the string of emails, there is no glint/glare study that addresses the issues raised by BNSF and confirmed as appropriate for a study by CEC's own consultant.   BNSF began providing the requested information but received an email from Mr. Jewell on August 3, 2010, stating "the Commission staff (including me) will not work on this further since there is a COC requiring collaboration on a solution.  But there will be a 'workshop' and I will, . . . Be Prepared.  Thanks for all your help.  I think I can help at the workshop." [Exhibit 1203 and Exhibit A attached thereto.]

131.   As Mr. Schell explained, the SSA II could be misread and misinterpreted to read as if BNSF fully participated, there was a study performed to address the specific rail safety and operations concerns raised by BNSF, the parties

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

came to an agreement, and BNSF is satisfied that its safety concerns have been addressed and will be mitigated.  Mr. Schnell testified that this did not happen.  BNSF was told that Mr. Jewell was going to prepare a study that analyzed the glint and glare issue in relation to the unique angles and field of vision that an engineer would encounter while traveling along the RoW.  BNSF provided information that Mr. Jewell represented he needed to perform his study.  That information was not used or referenced in the study.  Then Mr. Jewell sent BNSF an email saying no further work would be done and that we would collaborate on a solution.  He said there would be a workshop.  There was no workshop.  [Exhibit 1203.]

132.    Moreover, as Mr. Schnell further explained, the telephone conversations with the CEC consultants took place without the benefit of a draft report or any supporting information.  While BNSF was told a draft report would be available before the issuance of the Supplemental Staff Report, that did not occur.  Accordingly, the conversations were very general in nature and did not address BNSF's specific concerns.  Because no study had been performed, there was no meaningful discussion regarding mitigation measures.  At the time that the CEC decided that it would not perform its own study to address BNSF's rail safety issues and concerns, BNSF was advised that CEC was going to require in the Conditions of Certification: (1) a 300 foot setback from the edge of the BNSF ROW for the closest SunCatcher; (2) a site-specific study on the effects of the  SunCatcher's glint and glare on BNSF's safety, operations and signals, funded by Calico Solar; and (3)  workshops to be held to resolve BNSF's concerns.

133.    The CEC also offered to assist BNSF find a glint/glare expert with appropriate expertise.   Moreover, BNSF had only a little over a week between the issuance of the SSA Part II on August 9, 2010, and the hearing on August 18, 2010.  This was not adequate time to address all the issues raised for the first time in the SSA

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

Part II.  When Mr. Schnell actually read TRANS-7, it was clear that BNSF's concerns had not been addressed and that conclusions had been drawn about purported mitigation measures that were not based on any actual scientific study.  [Exhibit 1203.]

134.   Mr. Skeels provided the CEC with some of the technical explanations regarding the importance of signals in relation to the safe speed at  which a train can travel.  He also explained the phenomenon known as a "phantom signal," which is caused by  stray light sources entering the signals and either making them look like they are on when they are off or off when they are on.  [8/18/2010 TR at 110:13-115:11.]

135.   Mr. Skeels also provided the CEC with a Track Chart for the portion of track that Calico Solar seeks to surround with SunCatchers.  As Mr. Skeels explained, the Track Chart shows how elevation changes on that portion of the track, how speed must be adjusted upward and downward where there are significant curves in the track (e.g., right before East Pisgah), and the exact locations of the signals along the track, where Calico Solar proposes to emplace 34,0000 SunCatchers.  [8/18/2010 TR at 115:12-119:21; Exhibit 1204 and Exhibit C attached thereto.]

136.   The information sought by Mr. Jewell and the information from the Track Chart is the type of information that would be necessary for an expert such as Dr. Krauss to prepare a site-specific model.  Dr. Krauss explained that, as a Ph.D. in cognitive neuroscience, he is versed in the study of human perception, cognition, reaction time, and the effects of lighting and is capable of preparing a site-specific model to measure the effects of glint and glare on train operators in relation to the Project.  [8/18/2010 TR at 120:13-122:17.]

137.   Dr. Krauss testified that he agreed with the following findings in the SSA II at Appendix A page 7 of the Ho Glare/Glint Study that the SunCatchers could

- 28 -

cause temporary flash blindness, veiling reflections, and/or distracting glare, all of which would pose a significant risk to train engineers being able to see the signals.  He found scientific support for the findings regarding flash blindness, veiling reflections, and distracting glare in the Ho Glare/Glint Study.  [8/18/2010 TR at 123:13-23; SSA II at C.11-19.]

138.    Likewise, Dr. Krauss found support in the form of the testimony of Messrs. Schnell and Skeels for the proposition that train signals are essential for the safety of train engineers and crews.  [8/18/2010 TR at 123:24-124:13; C.11-19.]

139.    In relation to the SSA II's finding at C.11-19 that the adverse impacts of the SunCatchers was mitigable through the employment of hoods and shields to signals and/or LED signals, Dr. Krauss  reviewed the Ho Glare/Glint Study and found no scientific basis for that finding.  The Ho Glare/Glint Study makes no mention at all of signals, hooding, shielding, or LED signals.  [8/18/2010 TR at 123:1-9, 124:14-23; 127:8-25; Exhibit 1205.]

140.    Mr. Skeels testified that, despite his over 24-years of experience in train signals, he was not aware of any such current approved LED signal technology.  Mr. Skeels explained that BNSF is currently conducting testing of LED signal lights, but there presently is no standard LED signal that has been tested and approved for use by BNSF.  Moreover, shielding or hooding of signals requires coordination with federal authorities before BNSF makes any changes.[1]  [Exhibit 1204.]

141.    Dr. Krauss testified that the Ho Glare/Glint Study appeared to accurately measure the impact of a single SunCatcher in relation to temporary flash blindness.

---

[1] *See, e.g.,* the Rail Safety Improvement Act of 2008, which reserves to the FRA the sole and exclusive right, among other things, to control and regulate: (1) "[P]erformance standards for processor-based signal and train control systems" [49 U.S.C. §20171(7)]; and (2) "[The] qualification of new or novel technology at highway-rail grade crossings."  49 U.S.C. §20171(7).

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

1   While Dr. Krauss supported the minimum distance offset for a single SunCatcher of

2   223 feet, as calculated by Dr. Ho, Dr. Krauss noted that this offset does not account

3   for the fact that the Project envisions aligning thousands of SunCatchers, the

4   cumulative impact of which has not been measured.  As Dr. Krauss explained, the

5   phenomena of "spatial summation" – the increased and cumulative effect of thousands

6   of sources of light, and "temporal summation" – the impact of looking at thousands of

7   separate light sources over several minutes as the train passes where the eye sees a

8   new source just as it is about to recover from the previous  source – needs to be

9   measured.  [8/18/2010 TR at 125:18-127:3, Exhibit 1205.]

10       142.   According to Dr. Krauss, "because this is such a large-scale project, both

11   from a logistic standpoint . . ., but really from a safety standpoint, to go ahead and

12   install all of these SunCatchers prior to understanding what hazards they [pose] is

13   really a potential problem.  So the issue of whether they're aligned or not is irrelevant,

14   the point is the SunCatchers themselves are the hazard."  [8/18/2010 TR at 128:8-15.]

15       143.   Dr. Krauss further explained how he would model the Project through a

16   computer simulation and how there are at least twelve separate factors that need to be

17   measured and analyzed.  [8/18/2010 TR at 128:16-136:25.]

18       144.   Furthermore, Dr. Krauss pointed out that, while the Ho Glint/Glare

19   Study measured the impact of a single SunCatcher in relation to temporary flash

20   blindness, the Ho Glint/Glare Study also noted that veiling effects and/or distracting

21   glare are also likely to occur and need to be measured.  [8/18/2010 TR at 137:1-14;

22   SSA II at Appendix A at pages 6-7.]

23       145.   Dr. Krauss reviewed TRANS-7 and found it to be inadequate.  He

24   agreed with Mr. Lindsley's and Dr. Ho's testimony that it would be prudent to do a

25   computer model of the site and is prepared to do so.  He also agreed with Dr. Ho's

26   statement that it would be better if, in addition to the computer model, an off-site

27

28                                              - 30 -

replication of the site were performed before any SunCatchers were emplaced at the actual site.   This would allow Calico Solar and BNSF to "test" the "fidelity" of the model. [8/18/2010 TR at 137:15-140:15.]

146.   Accordingly, the CEC failed to adequately analyze the effect of glare and glint from SunCatchers on BNSF's ROW and rail operations.   Moreover, by admission of its own experts, the CEC lacked substantial evidence on which to base TRANS-7 and is impermissibly attempting to defer mitigation.

147.   Additionally, by its 11th-hour adoption of Alternative 5.5, the CEC failed to adequately analyze the impact of Alternative 5.5 on BNSF's ROW and rail operations.   This is particularly egregious in light of Calico Solar's stated intent to eliminate all of the debris and detention basins that were in previous Project footprints and were designed to mitigate the effects of flooding, runoff, and sedimentation on the BNSF ROW and rail operations.

148.   The CEC's Staff Expert, Casey Weaver, testified on September 20, 2010 that, for over a year the Project design layout analyzed included detention basins.   He also testified that he has not seen anything that would change his professional opinion about the validity of the original design, which included debris and detention basins. [9/20/2010 TR at 245:21-246:4.]

149.   Mr. Weaver also testified that "impacts due to flooding in these areas [all of which flow toward the BNSF ROW] are potentially significant without adequate mitigation."  [9/20/2010 TR 260:11-19.]

150.   When asked if, "[o]ther than the fact that on September 3rd the Committee issued an order requiring a reduced footprint, have you seen any other reason to justify the removal of the detention basins."  9/20/2010 TR at 266:21-267:4.]

151.   Accordingly, the CEC failed to adequately analyze the effect of Alternative 5.5 on BNSF's ROW and rail operations.   Moreover, by admission of its

- 31 -

own experts, the CEC lacked substantial evidence on which to base the Conditions of Certification relating to hydrology and is impermissibly deferring mitigation.

## CLAIMS FOR RELIEF

### CLAIM ONE: VIOLATION OF FLPMA

### (Against the Interior Defendants)

152. BNSF repeats, and by reference incorporates all preceding paragraphs.

153. A right-of-way issued by Interior under FLPMA must contain terms and conditions that "protect Federal . . . economic interests . . . [and] protect the other lawful users of the lands adjacent to or traversed by such a right-of-way." [43 U.S.C. §1765(b).]

154. A right-of-way granted pursuant to FLPMA must be compatible with an adjacent pre-FLPMA right-of-way. FLPMA does not grant the Secretary of the Interior the right to terminate, restrict, or impede the rights of the holder of a pre-FLPMA right-of-way. [43 U.S.C. §1769.]

155. BNSF's mainline is within BNSF's right-of-way ("ROW"), which is a pre-FLPMA right-of-way.

156. The Calico ROW issued pursuant to the ROD is adjacent to and/or traverses the BNSF ROW.

157. The glint and glare from the SunCatchers that will be emplaced within the Calico ROW will restrict or impede BNSF's right to unrestricted and unimpeded use of BNSF's ROW. Accordingly, the Calico ROW is incompatible with the prior, valid, pre-FLPMA use by BNSF of the BNSF ROW.

158. The hydrological and sedimentation impact from the Calico Solar Project will restrict or impede BNSF's right to unrestricted and unimpeded use of BNSF's ROW. Accordingly, the Calico ROW is incompatible with the prior, valid, pre-FLPMA use by BNSF of the BNSF ROW.

- 32 -

159. As such, the granting of the Calico ROW is incompatible with the pre-FLPMA BNSF ROW, and is therefore invalid.

**CLAIM TWO: VIOLATION OF NEPA –**

**NO FULL AND FAIR DISCUSSION OR HARD LOOK**

**(Against Interior Defendants)**

160. BNSF repeats, and by reference incorporates all preceding paragraphs.

161. Both FLPMA and the CDCA Plan require that lands adjacent to the Calico ROW be protected. Such protection cannot be accomplished without "full and fair discussion of significant environmental impacts" under NEPA and a discussion of the "means to mitigate adverse environmental impacts" as required by NEPA. [40 C.F.R. §1502.1; 42 U.S.C. §§4321, *et seq.*]

162. NEPA requires that the EIS contain a reasonably thorough discussion of significant aspects of probable environmental consequences and that the BLM take a "hard look" at the consequences. The "hard look" requires that mitigation measures must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.

163. Despite repeated requests that BLM evaluate the consequences of glint and glare to BNSF rail operations and safety, BLM has failed so.

164. There was no analysis of glint and glare in the SA/DEIS relating to BNSF's ROW and rail operations.

165. Despite BNSF's 7/1/2010 and 7/29/2010 comment letters, there was no analysis of glint and glare in the FEIS relating to BNSF's ROW and rail operations .

166. There are no mitigation measures identified in either the SA/DEIS, the FEIS, or the Calico ROD that would mitigate for the impact of glint and glare from the SunCatchers in relation to BNSF rail operations and safety or otherwise restrict Calico Solar's use of the Calico ROW to protect BNSF's operations.

- 33 -

167.   The 9/3/2010 Comment and Protest Letter clearly identifies the glint and glare issue and attaches the relevant testimonial exhibits of Schnell, Skeels, and Krauss.

168.   The Calico ROD does not add any Conditions of Certification that would protect BNSF,  although the clear safety hazard is acknowledged by BLM's insistence on a 500-foot offset  mitigation measure to arguably protect motorists. There is no similar protection for train crews.

169.   Accordingly, BLM failed to engage in a full and fair discussion of or take a hard look at the impact of glint and glare on BNSF's ROW and rail operations, in violation of NEPA

170.   Despite BNSF's 7/1/2010 and 7/29/2010 comment letters, and BNSF's supplemental comment letters of October 19, 2010, there was no analysis of the Modified Agency Preferred Alternative subject to public comment through the FEIS.

171.   There are no adequate mitigation measures identified in the Calico ROD that would mitigate for the impact of the Modified Agency Preferred Alternative, particularly in light of Calico Solar's stated intent to eliminate debris and detention basins.

172.   BNSF's letters and relevant testimonial exhibits clearly identify the hydrological issues raised by the Modified Agency Preferred Alternative.

173.   The Calico ROD does not add any Conditions of Certification that would protect the BNSF ROW, or its operations and infrastructure, although the clear safety hazard is acknowledged by BLM's inclusion of debris and detention basins in every prior preferred agency alternative before the Modified Agency Preferred Alternative.

- 34 -

174.   Accordingly, BLM failed to engage in a full and fair discussion of or take a hard look at the impact of the Modified Agency Preferred Alternative on BNSF's ROW and rail operations, in violation of NEPA

## CLAIM THREE: VIOLATION OF NEPA –
## IMPERMISSIBLE  ABDICATION
### (Against Interior Defendants)

175.   BNSF repeats, and by reference incorporates all preceding paragraphs.

176.   BLM cannot abdicate its NEPA responsibilities.   While coordination with other federal and state agencies is permitted, and tasks can be apportioned to other agencies, as lead agency BLM must independently evaluate all information submitted and be responsible for its accuracy.

177.   According to the May 5, 2010 Notice of Availability, BLM expressly found that "the two agencies have now determined that it is necessary to produce separate, but coordinated, final environmental reviews and decision documents." Accordingly, BLM cannot rely on the MOU with the CEC on a going-forward basis after May 5, 2010, and must independently review, judge and analyze all information submitted as part of the EIS.

178.   The FEIS does not incorporate by reference or otherwise adopt the study, analysis and concomitant findings of the CEC in relation to the CEC's supplemental staff assessments.   In fact, it could not have done so because the FEIS was issued on August 6, 2010, and the CEC's SSA II was not issued until three days later, on August 9, 2010.   The CEC Staff's supplemental assessment of the Modified Agency Preferred Alternative was not available until October 15, 2010, and the CEC's evidentiary hearings did not conclude until after the ROD was issued by BLM.

- 35 -

179.    There is no evidence in the record that BLM independently reviewed, judged, and analyzed the CEC's supplemental staff assessments or evidentiary record as it pertains to the effect of glint and glare on rail operations and safety.

180.    Likewise, there is no evidence in the record that BLM independently reviewed the hydrological and sedimentation impacts of the Modified Agency Preferred Alternative on rail operations and safety.

181.    Accordingly, without a proper independent evaluation of the CEC's assessment of glint and glare on BNSF's ROW and rail operations and concomitant Conditions of Certification, BLM has impermissibly abdicated its responsibilities under NEPA.

182.    Likewise, without a proper independent evaluation of the CEC's assessment of the Modified Agency Preferred Alternative on BNSF's ROW and rail operations and concomitant Conditions of Certification, BLM has impermissibly abdicated its responsibilities under NEPA.

**CLAIM FOUR: VIOLATION OF NEPA –**

**FAILURE TO RE-CIRCULATE**

**(Against Interior Defendants)**

183.    BNSF repeats, and by reference incorporates all preceding paragraphs.

184.    BLM must independently review the new project alternative – referred to in the CEC proceeding as Alternative 5.5 and in the Calico ROD as the Modified Agency Preferred Alternative – and provide the public with the opportunity to comment on that analysis.  [40 C.F.R. §1502.9.]

185.    Alternative 5.5/Modified Agency Preferred Alternative was not analyzed in either the SA/DEIS or the FEIS.

186.    There was never an opportunity for the public to comment on Alternative 5.5/Modified Agency Preferred Alternative.

- 36 -

187.    Alternative 5.5/Modified Agency Preferred Alternative reduces the acreage utilized by over 1600 acres and reduces mega-watt capacity by over 180-MW.

188.    Alternative 5.5/Modified Agency Preferred Alternative eliminates project features in the form of debris and detention basins that were always part of every construction alternative analyzed in the SA/DEIS and FEIS.

189.    Alternative 5.5/Modified Agency Preferred Alternative is not identified or analyzed in any of the NEPA documents – the SA/DEIS and FEIS, which is a prerequisite of a Determination of NEPA Adequacy.

190.    Through the second DNA [Appendix 6 to the Calico ROD], BLM purports to have independently reviewed Alternative 5.5/Modified Agency Preferred Alternative.

191.    The second DNA is improper and illegal and impermissibly attempts to avoid BLM's duty to re-circulate the Modified Agency Preferred Alternative for comment to the public.

### CLAIM FIVE: PREEMPTION

### (Against Interior Defendants and Commission Defendants)

192.    BNSF repeats, and by reference incorporates all preceding paragraphs.

193.    BLM cannot abdicate its NEPA responsibilities to independently review, analyze, and judge all information submitted as part of the environmental impact study.

194.    BLM cannot abdicate its responsibility under FLPMA to ensure that the Calico ROW does not interfere with BNSF's full and unrestricted use of its pre-FLPMA right-of-way.

195.    Glint and glare from 26,540 SunCatchers under the Modified Agency Preferred Alternative pose a significant health and safety risk to rail operations and is

- 37 -

recognized by BLM as a significant environmental impact on receptors in that BLM has mandated a 500-foot offset from I-40.

196.   There is no provision in the Calico ROD either to assess the risk to rail operations and safety or otherwise mitigate the hazard.

197.   BLM has improperly abdicated this responsibility to the CEC and Interior has approved the Calico ROD and ROW without ensuring that BNSF is protected and that the Calico Solar Project will comply with exclusive federal laws, regulations and standards that preempt either other federal agency or state interference.

198.   The Calico Solar ROD and ROW were issued before the CEC issued the Commission Decision approving certification of the Calico Solar Project.

199.   The Commission Decision requires BNSF to "work with" Calico Solar to, among other things, "determine the appropriate size and design of shields to be affixed to signal lights as well as measures to increase the contrast of the signal light, including orienting the appropriately sized shield around the signal light and increasing the brightness of the signal emitter over historic light levels using current LED signal technology."   [Commission Decision, Transportation and Traffic, TRANS-7 at p. 14.]

200.   The Commission Decision provides that Calico Solar submit a plan to provide for signal light modification to the Commission Project Manger for "review and approval."   [Commission Decision, Transportation and Traffic, TRANS-7 at p. 14.]

201.   Rail operations, including signal operations, are within the exclusive purview of the federal government and are subject to federal laws, regulations, and standards, including but not limited to ICCTA, RSA,  RSIA and GCOR.

- 38 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

202.   BNSF rail operations are regulated and overseen by various federal agencies, such as the FRA and the Surface Transportation Board (the "STB").

A.   ICCTA

203.   ICCTA completely preempts state and local regulation of railroads on matters vested exclusively with the Surface Transportation Board ("STB").

204.   Pursuant to ICCTA, the STB is given jurisdiction over both interstate and intrastate rail transportation.  [49 U.S.C. §10501(a)(2)(A).]

205.   In particular, ICCTA gives the STB exclusive jurisdiction over all rail operations and facilities:

(b)   The jurisdiction of the [STB] over –

(1)   transportation by rail carriers, and the remedies provided with respect to rates, classifications, rules (including car service, interchange, and other operating rules [such as but not limited to GCOR], practices, routes, services, and facilities of such carriers; and

(2)   the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side track, or facilities, even if the tracks are located, or intended to be located, entirely in on State, is exclusive.

Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies under Federal or State law.

[49 U.S.C. §10501(b)(1) & (2).]

206.   ICCTA defines "railroad" to include "a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation."  [49 U.S.C. §10102(6)(C).]

- 39 -

207.   ICCTA defines "transportation" to include, among other things, "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use" and "the services related to that movement."  [49 U.S.C. §10102(9)(A) & (B).]

208.   Under ICCTA, it is the policy of the United States Government to promote a sound national rail transportation system "to meet the needs of the public and the national defense." [49 U.S.C. §10101(4).]

209.   Under ICCTA, neither BLM nor the CEC have authority to regulate rail operations or facilities that are part of the interstate rail transportation system.

210.   Neither BLM nor the CEC is authorized by law to direct BNSF to perform signal light modification to accommodate the Calico Solar Project.

211.   The Commission Decision issued by the CEC and tacitly adopted by abdication by the BLM, which requires BNSF to submit to oversight and regulation of signal operations and related functions by the CPM, is in violation of ICCTA.

B.   FRSA and RSIA

212.   The FRA operates under a comprehensive set of statutes and regulations codified under Title 49 of the United States Code.   Under those statutes and regulations, the FRA has the sole and exclusive right to control and regulate:

a)   "[P]erformance standards for processor-based signal and train control systems" [49 U.S.C. §20161(7)];

b)   "[The] qualification of new or novel technology at highway-rail grade crossings" [49 U.S.C. §20161(7)];

c)   The duties and responsibilities, to include specifically limiting the duty hours, of railway signal employees [49 U.S.C. § 21104]; and

- 40 -

d)   Federally funded capital projects designed to, among other things, "mitigat[e] environmental impacts [and implement] communication and signalization improvements." [49 U.S.C. §24401(2)].

213.   Under the FRSA and the RSIA, the improvement of signal technology is within the purview of the FRA and is not subject to state or local regulations.  For example, the RSIA provides that: "[r]ailroad carriers and railroad suppliers may submit for review and approval to the Secretary [of Transportation] such new technology designed to improve safety at highway-rail grade crossings.  The Secretary shall approve by order the new technology designed to improve safety at highway-rail grade crossings in accordance with Federal Railroad Administration standards for the development and use of processor-based signal and train control systems and shall consider the effects on safety of highway-user interface with the new technology." [49 U.S.C. §20161(c).]

214.   Secretarial approval of any such technology, to include such technology that improves signal and train control systems such as that required by the CEC through TRANS-7, "preempts any State statute or regulation concerning the adequacy of the technology in providing warning at the crossing."  [49 U.S.C. §20161(d).]

215.   Accordingly, by implementing TRANS-7, the CEC is improperly interfering in the design and specification of signal technology in relation to an approximately five mile length of the BNSF mainline.  Because applicable federal law preempts such regulation, it is invalid.

C.   GCOR

216.   Similarly, GCOR are operating rules and regulations that are designed by rail carriers such as BNSF and adopted by the FRA.  As such, they have the force of FRA regulations.

- 41 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

217.   GCOR require a train crew to apply emergency application of the brakes and stop a train if the train crew cannot properly ascertain a signal as the train is approaching the signal and rail crossings.  When a train has been stopped through emergency application of the brakes, GCOR requires the engineer to inspect all cars, units, equipment and track pursuant to  BNSF special instructions and rules.  This can cause significant delays to rail operations with ramifications reaching from the Ports of Los Angeles and Long Beach to Chicago and beyond.

218.   Glint and glare from SunCatchers is a known hazard to train crews. That hazard has not been properly evaluated through a site specific, rail specific study.

219.   TRANS-7 purports to mitigate the effect of glint and glare from SunCatchers but is not supported by substantial evidence. Regardless, TRANS-7 improperly invades an area of law that has been preempted by federal law and regulation.

220.   By improperly abdicating its responsibilities under NEPA and FLPMA in relation to glint and glare on rail operations and safety to the CEC, BLM is violating federal laws, regulations and standards that preemptively reserve such oversight and regulation to other federal agencies.

221.   By purporting to assert authority over BNSF to direct BNSF regarding safety measures that BNSF must employ on BNSF's mainline in order to accommodate the Calico Solar Project, the CEC is impermissibly interfering with federal, laws, regulations and standards that preempt state agency oversight and direction.

## CLAIM SIX: VIOLATION OF THE COMMERCE CLAUSE
### (Against Commission Defendants)

222.   BNSF repeats, and by reference incorporates all preceding paragraphs.

- 42 -

223.   The Commerce Clause of the United States Constitution, Art. 1, § 8, cl. 3, provides that "the Congress shall have the power . . . to regulate Commerce . . . among the several States . . .."

224.   The promotion and protection of interstate commerce is a central function of the Federal Government and recognizes that the free flow of goods and materials throughout the nation is essential to the national economy.  State and local laws or regulations that discriminate against or unduly burden interstate commerce violate the Commerce Clause and are, accordingly, invalid.

225.   A state violates the "negative implications" of the commerce clause by unilaterally enacting laws, regulations or standards which unduly burden or discriminate against interstate commerce.

226.   The majority of rail business in California is interstate business, originating and/or terminating outside the state.  Much of BNSF's business transited over the BNSF mainline originate or terminates internationally and traverses the state on the way to destinations across the country and outside the country.  The operations of BNSF along the BNSF mainline largely support both interstate and international commerce.

227.   The CEC, as an agency of the State of California, has issued the Commission Decision.

228.   The Commission Decision improperly directs BNSF to take certain actions in relation to train signal safety within BNSF's right-of-way.

229.   The Commission Decision improperly confers upon the CEC, through the person of the CPM, the authority to approve a plan proposed by Calico Solar to modify signals with the BNSF ROW.

230.   There is no scientific study that supports the assumption that train signal lights within the BNSF ROW can be modified so that train crews can operate safely

- 43 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

within the BNSF ROW without being adversely impacted from the glint and glare from tens of thousands of SunCatchers.

231.   If a train crew cannot see and respond to a train signal in a timely manner, the train crew must order an emergency stop of the train.

232.   Trains operating within the BNSF ROW within the Calico ROW carry essential goods and materials among 28 states and Canada.

233.   Emergency stops and potential derailments of such trains within the BNSF ROW within the Calico ROW would necessarily unduly burden against interstate commerce.

### CLAIM SEVEN: VIOLATIONS OF CEQA AND
### WARREN-ALQUIST ACT – LACK OF SUBSTANTIAL EVIDENCE
### (Against Commission Defendants)

234.   BNSF repeats, and by reference incorporates all preceding paragraphs.

235.   The CEC certification process is CEQA-equivalent under Public Resources Code Sections 25500 *et. seq.* and the regulatory process is the functional equivalent of an Environmental Impact Report under Public Resources Code Section 21080.5.

236.   Accordingly, the CEC must comply with CEQA and the CEC's underlying regulatory scheme.

237.   CEQA requires that the rules and regulations adopted by the administering agency for the regulatory program . . . "[r]equire that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen a significant adverse effect that the activity may have on the environment."   [Cal.Pub.Res. Code §21080.5(d)(2)(A).]

- 44 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

238. The Commission may not certify a project unless it specifically finds that: (1) changes or alterations in the project have been incorporated that will mitigate or avoid any significant effects on the environment; or (2) mitigation measures or alternatives are not feasible and there are specific, clearly articulated overriding benefits of the project that outweigh the significant environmental impact that will necessarily result if the project is certified.

239. The Commission may not certify any site and related facilities for which one or more significant adverse environmental effects have been identified unless the Commission makes both of the following findings:

(1)     With respect to matters within the authority of the Commission, that changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant environmental effects identified in the proceeding.

(2)     With respect to matters not within the Commission's authority but within the authority of another agency, that changes or alterations required to mitigate such effects have been adopted by such other agency, or can and should be adopted by such other agency.

[20 Cal.Code.Regs. §1755(c-d).]

240. These findings must be supported by substantial evidence in the record and the Commission must bridge the analytical gap between the evidence and the findings. [Cal.Pub.Res. Code § 21081.5; 14 Cal.Code Regs. §§ 15091(b), 15093.]

241. Substantial evidence does not include argument, speculation, unsubstantiated opinion or narrative, or evidence that is clearly inaccurate or erroneous. [Cal.Pub. Res. Code §§21080(e), 21082.2(c).]

242. An approval must be set aside if the agency approves a project without first making a proper determination of whether there are feasible mitigation measures

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

available that will avoid or substantially lessen significant environmental effects, as required by CEQA.

243.   The Commission Decision specifically finds that "Suncatcher mirrors have the potential to produce glint and glare near . . . the BNSF Railroad right-of-way."  [Commission Decision, Traffic and Transportation, p. 9.]

244.   The Commission Decision specifically finds that "Condition of Certification TRANS-7 will reduce these impacts."  [Commission Decision, Traffic and Transportation, p. 9.]

245.   The effect of glint and glare on BNSF train crews is significant.

246.   The CEC improperly proceeded to certify the Calico Solar Project without substantial evidence that TRANS-7 will, in fact, reduce the significant impacts to BNSF trains crews to less than significant.

247.   Without a site specific, rail specific study of the impacts of glint and glare on BNSF train crews, there is no substantial evidence to support TRANS-7.

248.   There is no substantial evidence to support the portion of TRANS-7 that mandates "Signal Light Modifications."

249.   No such finding can in fact be made before a site specific, rail specific study is performed to analyze the impact of glint and glare from SunCatchers on the BNSF ROW and rail operations.

250.   The CEC adopted Alternative 5.5, which calls for the elimination of a complex set of debris and detention basins covering approximately 600 acres (roughly ten percent) of the previous Project site footprint.

251.   The inclusion of debris and detention basins in prior plans before Alternative 5.5 was supported by substantial evidence.  The elimination of debris and detention basins in Alternative 5.5 is not supported by substantial evidence.

- 46 -

252. There is no substantial evidence to support a determination that the Conditions of Certification adopted by the CEC that purport to mitigate the impact of Alternative 5.5 in relation to its adverse hydrological and sedimentation impact on the BNSF ROW and rail operations, will in fact mitigate those adverse impacts.

253. Accordingly, the certification of the Calico Solar Project through the Commission Decision and concomitant adoption of Conditions of Certification lack substantial evidence and violate CEQA and the Warren-Alquist Act.

## CLAIM EIGHT: VIOLATIONS OF CEQA AND WARREN-ALQUIST ACT – IMPERMISSIBLE DEFERRED MITIGATION
### (Against Commission Defendants)

254. BNSF hereby repeats, and by reference incorporates all preceding paragraphs.

255. Under CEQA, the Commission is not permitted to defer the requisite studies necessary to assess environmental impacts and ascertain whether mitigation measures are feasible. Specific mitigation details may be deferred, but only in limited circumstances.

256. Deferral of specific mitigation measures is only permissible where the Commission has: (1) undertaken a thorough and complete analysis; (2) proposed potential mitigation measures early on in the certification process; and (3) articulated specific performance criteria in its Conditions of Certification that will ensure that appropriate and adequate mitigation measures will be implemented to bring the impact to less than significant.

257. The CEC did not perform a site specific, rail specific study of the impact of glint and glare on BNSF's train crews.

258. Without such a study, the deferred mitigation proposed by TRANS-7 is not permissible.

- 47 -

259.   The Conditions of Certification adopted by the CEC that purport to mitigate the impact of Alternative 5.5 in relation to its adverse hydrological and sedimentation impact on the BNSF ROW and rail operations, entail numerous studies that have yet to be performed.

260.   Such reliance on studies that have not yet been performed is an impermissible deferral of mitigation.

261.   Accordingly, the certification of the Calico Solar Project through the Commission Decision and concomitant adoption of Conditions of Certification contain impermissible deferred mitigation measures that violate CEQA and the Warren-Alquist Act.

## **PRAYER FOR RELIEF**

Wherefore, BNSF prays for judgment as follows:

A.   Declaring that the Interior Defendants violated NEPA, FLPMA, the APA, and the CDCA Plan by approving, executing, and issuing the Calico ROD and Calico ROW.

B.   Declaring that Interior Defendants and Commission Defendants violated applicable federal laws, regulations and standards applicable to rail safety by approving, executing and issuing the Calico Rod, the Calico ROW, and the Commission Decision.

C.   Declaring that Commission Defendants violated CEQA and the Warren-Alquist Act by approving, executing, and issuing the Commission Decision.

D.   Vacating the Calico ROD.

E.   Vacating the Calico ROW.

F.   Vacating the Commission Decision.

G.   Directing Interior Defendants not to approve, execute or issue any further Record of Decision relating to the Calico Solar Project without first fully and

- 48 -

faithfully performing their respective duties under NEPA, FLPMA, the APA, and the CDCA Plan, to include:

a)   Ensuring proper a proper glint and glare study that is both site specific and rail specific is performed to analyze the impact of glint and glare from tens of thousands of SunCatchers on BNSF train crews;

b)   Independently reviewing and analyzing all environmental impacts and potential mitigation measures;

c)   Recirculating the DEIS for review and comment with the above information and a full and complete description of the Modified Agency Preferred Alternative.

H.   Directing the Commission Defendants not to approve, execute or issue any further Commission Decision relating to the Calico Solar Project without first fully and faithfully performing their respective duties under CEQA and the Warren-Alquist Act, to include:

a)   Ensuring proper a proper glint and glare study that is both site specific and rail specific is performed to analyze the impact of glint and glare from tens of thousands of SunCatchers on BNSF train crews;

b)   Ensuring that substantial evidence supports both the Commission's findings and any concomitant Conditions of Certification.

I.   For a preliminary and permanent injunction prohibiting development of the Calico Solar Project, including issuance of any notices to proceed, authority to construct, or ground-breaking activities, until Interior fully and fairly performs its duties under NEPA, FLPMA, the APA, and the CDCA Plan.

J.   For a preliminary and permanent injunction prohibiting development of the Calico Solar Project, including issuance of any notices to proceed, authority to

- 49 -

construct, or ground-breaking activities, until the Commission fully and fairly performs its duties under CEQA and the Warren-Alquist Act.

K.   For a preliminary and permanent injunction prohibiting Interior Defendants from issuing any orders or directives to BNSF that have any impact on rail operations, including train signals.

L.   For a preliminary and permanent injunction prohibiting Commission Defendants from issuing any orders or directives to BNSF that have any impact on rail operations, including train signals.

M.   For BNSF's reasonable attorneys' fees  pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

N.   For costs of suit;

O.   For such further injunctive, equitable, and other relief as the Court may deem just and proper.


KATTEN, MUCHIN ROSENMAN LLP


Dated:  December 29, 2010          By:  _S A LAMB_____
                                        Cynthia L. Burch
                                        Steven A. Lamb
                                        Anne Alexander


- 50 -

COMPLAINT OF BNSF RAILWAY FOR
DECLARATORY AND INJUNCTIVE RELIEF

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Stephen V. Wilson and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV10- 10057 SVW (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Cynthia L. Burch (SBN 86020 )
Steven A. Lamb (SBN 132534)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, California 90067-3012

ORIGINAL

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| BNSF RAILWAY COMPANY, a Delaware Corporation,<br><br>v.<br>PLAINTIFF(S)<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; SEE ATTACHMENT FOR ADDITIONAL DEFENDANTS<br>DEFENDANT(S). | CASE NUMBER<br><br>CV 10 - 10057SVW (PJWx)<br><br><br>SUMMONS |

TO:    DEFENDANT(S): <u>UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.</u>

A lawsuit has been filed against you.

Within _____ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _____Steven A. Lamb_____, whose address is Katten Muchin Rosenman LLP, 2029 Century Park E., Ste. 2600, Los Angeles, CA 90067. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

TERRY NAFISI

Clerk, U.S. District Court

Dated:    DEC 29 2010

By: _____
                   Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                   SUMMONS

ORIGINAL

COPY

Name & Address:
Cynthia L. Burch (SBN 86020 )
Steven A. Lamb (SBN 132534)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, California 90067-3012

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BNSF RAILWAY COMPANY, a Delaware Corporation,<br><br>PLAINTIFF(S)<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; SEE ATTACHMENT FOR ADDITIONAL DEFENDANTS<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV  10 - 10057 SVW (PJWx)<br><br>SUMMONS |

TO:   DEFENDANT(S): <u>UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.</u>

A lawsuit has been filed against you.

Within _____ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _____Steven A. Lamb_____, whose address is <u>Katten Muchin Rosenman LLP, 2029 Century Park E., Ste. 2600, Los Angeles, CA 90067</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.

TERRY NAFISI

Clerk, U.S. District Court

Dated:   DEC 29 2010

By: _____L. MURRAY_____
          Deputy Clerk

          *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.   Allowed 60 days by Rule 12(a)(3)].*

ORIGINAL

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| BNSF RAILWAY COMPANY, a Delaware Corporation | UNITED STATES DEPARTMENT OF THE INTERIOR, et al. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>KATTEN MUCHIN ROSENMAN LLP<br>2029 Century Park East, Suite 2600<br>Los Angeles, California 90067-3012 | Attorneys (If Known)<br><br>Cynthia L. Burch (SBN 86020 )<br>Steven A. Lamb (SBN 132534) |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☒ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No      ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
see attached

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☒ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: _____ CV10- 10057 SVW (PJWx)

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

ORIGINAL

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Texas |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☑ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _SA Lantz_    Date December 29, 2010

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

MC-025

| SHORT TITLE: BNSF RAILWAY CO. vs. U.S. DEPT. OF THE INTERIOR, et al. | CASE NUMBER: CV10- 10057 SVW (PJWx) |
|---|---|

ATTACHMENT *(Number):* _____1_____

*(This Attachment may be used with any Judicial Council form.)*

Civil Case Cover Sheet CV-71 (05/08)

Section VI.  CAUSES OF ACTION

Claim One:   Violation of Federal Land Policy and Management Act, 43 U.S.C. §§1701 et seq.

Claim Two:   Violation of National Environmental Policy Act, 42 U.S.C. §§4321 et seq.

Claim Three:   Violation of National Environmental Policy Act, 42 U.S.C. §§4321 et seq.

Claim Four:   Violation of National Environmental Policy Act, 42 U.S.C. §§4321 et seq.

Claim Five:   Preemption, National Environmental Policy Act, 42 U.S.C. §§4321 et seq.,Federal Land Policy and Management Act, 43 U.S.C. §§1701 et seq., Federal Railroad Safety Act of 1970, 49 U.S.C. §§20101-20144; 21301-21304; Rail Safety Improvement Act of 2008, Public Law 110-432; Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. §§10101, et seq., 28 U.S.C. §1331,

Claim Six:   Commerce Clause, U.S.C.A. Const. Art. 1, 8, cl. 2

Claim Seven: Violations of California Environmental Quality Act,. Cal. Pub.Res. Code §§21000 et seq., Warren-Alquist Act, Cal.Pub.Res. Code §§25500 et seq.,  28 U.S.C. §1367

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page ___1___ of ___1___

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT
to Judicial Council Form**

www.courtinfo.ca.gov